IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LISA ENGLAND, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. G-07-113 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 9), Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No. 10), and Plaintiff's Motion for Summary Judgment (Document No. 8). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 9) be DENIED, that Plaintiff's Motion for Summary Judgment (Document No. 8) be GRANTED, and that the decision of the Commissioner be REMANDED for further proceedings.

**I.  Introduction**

Plaintiff Lisa England ("England") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB").  England argues that substantial evidence does not support the ALJ's decision, and that the ALJ, Daniel Curran, committed errors of law when he found that England was not disabled, that she had the residual functional capacity ("RFC") for light work and could perform her past relevant work as a bank lead operations representative, and that she was therefore, not disabled.   England contends that the ALJ failed to apply the appropriate legal standards, and that substantial evidence does not support the ALJ's decision.  According to England, the ALJ erred in his RFC assessment, credibility finding, and rejection of the opinions offered by her treating physicians.  England moves the Court for an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claim for further proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that England was not disabled as a result of her impairments, the decision comports with applicable law, and that it should therefore be affirmed.

**II.  Administrative Proceedings**

England applied for DIB on November 9, 2004, claiming that she has been unable to work since April 15, 2004, due to obesity, osteoarthritis, anxiety, hypertension, carpal tunnel syndrome, bilateral knee problems, and degenerative disc disease.   (Tr. 57-70). The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 24-33).  After that,

England requested a hearing before an ALJ. (Tr. 34).  The Social Security Administration granted her request and the ALJ held a hearing on April 11, 2006, at which England's claims were considered *de novo*.  (Tr. 348-373).  On May 17, 2006, the ALJ issued his decision finding England not disabled. (Tr. 11-21).  The ALJ, at step one, found that England had not engaged in substantial gainful activity since the alleged onset of disability.  At steps two and three, he found that England had osteoarthritis, degenerative disc disease, hypertension, obesity, carpal tunnel syndrome, bilateral knee problems, and anxiety, all of which are severe impairments within the meaning of the Act, but that these impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment.  Based on the medical records, and the testimony of England, the ALJ concluded that England had the residual functional capacity ("RFC") to perform a full range of light work and based on those findings, at step four, the ALJ found that England could perform the requirements of her past relevant work as a bank lead operations representative as she actually performed the job, namely, in which England was "required to sit up to 5 hours, stand up to 1 hour, but was not required to walk. Further, she was required to " reach, write, type of (sic) handle small objects up to 5 hours, as well as lift less than 10 pounds frequently and up to 20 pounds occasionally, which she noted, was basically lifting bank trays as needed."  (Tr. 20).  The ALJ ultimately concluded England was not disabled within the meaning of the Act.

England then asked for a review by the Appeals Council of the ALJ's adverse decision.  (Tr. 9-10).  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R.     §§

404.970, 416.1470.  After considering England's contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on January 10, 2007, that there was no basis upon which to grant England's request for review.  (Tr. 5-8).  The ALJ's findings and decision thus became final.  England has timely filed her appeal of the ALJ's decision.  42 U.S.C. § 405(g).  Both England and the Commissioner have filed Motions for Summary Judgment (Document Nos. 8 & 9).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 373.  (Document No. 6).  There is no dispute as to the facts contained therein.

## III.  Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g).  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates

against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).


## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

[She] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v.*

*Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, at step 4, the ALJ found that England, despite her impairments and limitations, could perform her past relevant work, and that she therefore was not disabled within the meaning of the Act.  As a result, the Court must determine whether substantial evidence supports the ALJ's step four finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

**V.  Discussion**

The objective medical evidence shows that England had complained of and has been treated for a variety of impairments since 2000.  With respect to hypertension, the records show that England had been treated for hypertension and the records further reflect that her hypertension has been controlled through medication.  Likewise, as to obesity, the medical records dating back to January 3, 2000, indicate that England has been diagnosed with obesity, and that by May 2005, her size impacted her ability to get off an examination table.  (Tr. 289).

In 2001, England was treated  for bilateral elbow pain by Dr. Gregory Greer.  (Tr. 210).  On January 1, 2001, the doctor noted that England's arms were tender around the  lateral epicondyle. (Tr. 210).  At England's follow-up appointment on February 21, 2001, for myofascial pain syndrome,

Dr. Greer noted that England had normal strength and tone in her upper extremity and a good range of motion in her shoulders, elbows and wrists. In addition, England had no numbness or tingling. Also, there was no tenderness on palpation of the upper back and lower neck region. (Tr. 208-209). England returned less than a month later, on March 7, 2001. (Tr. 207, 208). Again, the range of motion in England's shoulder was good, she had no swelling, redness or stiffness in her joints, and had minimal swelling in the ulnar aspect of forearm. (*Id*). At England's July 19, 2001, visit she was seen for her complaints of right knee pain following a fall. (Tr. 207).

On January 21, 2002, England was seen by Dr. Heba Ferguson. England weighed 336 pounds and her blood pressure measured 134/98. (Tr. 206). According to the treatment note, England had been "battling workers comp for overuse keyboard injuries with bilateral carpal tunnel syndrome, cervical thoracic strain and myofascial pain syndrome." (Tr. 206). Dr. Ferguson referred England for an echocardiogram. She had the procedure on January 28, 2002. (Tr. 156). England had a normal left ventricle with ejection fraction of 58%, normal right ventricle, normal left atrium, normal mitral valve, and normal aortic valve. (Tr. 156). England had follow up office visits with Dr. Ferguson on February 18 and February 28, 2002, which were unremarkable. (Tr. 204, 205). England was not seen again by Dr. Ferguson until April 9, 2002, at which time she was treated for soreness in her legs. (Tr. 203). England's examination showed:

> Blood pressure is 120/86. In general, alert and oriented female who is in no apparent distress except when she does walk. Exam of the back revealed tenderness over the S1 joint on the right side. There was minimal effusion seen with both knees but there was a great amount of crepitus noted with flexion and extension of the knees. The pivot shift test was negative. On both sides, there was tenderness over the lateral muscle insertion at the knees bilaterally and there is also tenderness over the metamarsals dorsally. However, there is no swelling or bruising seen. The patient is able to bear weight. (Tr. 203).

Dr. Ferguson opined that England had "clinical osteoarthritis of the knees, hips and feet with crepitus noted." (Tr. 203). At England's May 16, 2002, appointment with Dr. Ferguson, she had lost 14 pounds (weighed 311 pounds), and her blood pressure was 138/88. England complained about a knot in her shoulder. Dr. Ferguson's examination showed that England had tenderness over the cervical paraspinous muscles and the trapezius region. England had a good range of motion at the shoulder but had a limited range of motion with lateralization of the neck. (Tr. 202). At England's next appointment with Dr. Ferguson on September 12, 2002, England reported she had been doing well with knee pain following steroid injections but recently had swelling and stiffness in her knees. (Tr. 201). England's blood pressure was 120/82. According to the treatment note, England had "definite effusion and swelling around the left knee joint." The doctor opined that England had "probable acute litagental injury of the left knee" and a "bone spur of the right knee." (Tr. 201). England was referred for an MRI of both knees, which she underwent on September 13, 2002. (Tr. 157-161). The MRI showed:

> Bilateral joint effusions with findings indicating mild osteoarthritis with medial joint compartment narrowing and osteophytosis. No discrete meniscal tear is seen in either knee and the ligaments are intact. (Tr. 157).

At England's September 20, 2002, appointment, Dr. Ferguson noted that her blood pressure was stable but that her weight was up nine pounds. Dr. Ferguson went over the MRI results with England, namely, that she had only mild arthritis and no ligamental tear. (Tr. 200). England was seen by Dr. Ferguson on December 23, 2002, for a follow up on her hypertension and cholesterol. (Tr. 198, 199). England's blood pressure was "stable" and she had lost eight pounds. (Tr. 198).

In 2003, England was primarily treated by Dr. Mark Dobyns. Her first appointment was February 21, 2003, at which time England complained of discomfort in the forearms and wrists. (Tr.

9

191, 192).  Dr. Dobyns described England as "morbidly obese."  He also noted she had tenderness

over the wrists to palpatation.  Her grip strength was strong and she had a mildly positive Tinel's sign

on the right only.  England had no muscle wasting.  Her reflexes in the upper extremities were 2+ and

symmetrical.  With respect to her back, she had a normal range of motion of the cervical spine.  She

did, however, have some soreness on palpation on the base of neck and the trapezius muscle.  Dr.

Dobyns completed an occupational health services form, in which he opined that England had bilateral

forearm sprain and that she could return to work as long as she was not required to lift over 15

pounds and do repetitive movements in both hands.  (Tr. 188).  Because of England's repeated

complaints of numbness and paresthesias in the palms of both hands and aching pains in both

shoulders, Dr. Dobyns referred England for an EMG/Nerve conduction study.   She underwent the

testing on March 24, 2003.  (Tr. 162-166).  The study showed:

> Normal EMG/nerve conduction studies of both arms.  There is no electrodiagnostic
> evidence of focal neuropathy, generalized neuropathy, plexopathy or radiculopathy.
> (Tr. 162)

Dr. Dobyns went over the results of the nerve conduction study with England at her March 26, 2003,

appointment.  (Tr. 187).  England reported that her "symptoms have improved."  (Tr. 187).  The

examination revealed that she had no muscle wasting, a negative Tinel's sign on the left and the test

was "mildly positive" on the right."  England's grip strength was strong.  (Tr. 187).  England was

next seen by Dr. Dobyns on April 16, 2003, at which time he noted that England was under no

distress, had excellent strength bilaterally, her grip strength was strong bilaterally, she had some mild

tenderness along the forearm, she had a negative Tinel's sign at the elbow, a negative Tinel's sign

bilaterally and a negative median nerve compression test bilaterally.   (Tr. 181).  Based on the

examination results, Dr. Dobyns opined that England could work as long it did not require lifting over

15 pounds and that she could use her right and left hand as tolerated with a two pound limit.  (Tr. 179).

England's next appointment with Dr. Dobyn's was on May 7, 2003, at which time she reported that her left arm was better but that her right arm was symptomatic.  (Tr. 177, 178). According to the treatment note, England had tenderness directly over the lateral epicondyle that increased with resisted supination and extension.  Her grip strength was strong and symmetrical.  The results of the Tinel's test was negative at the elbow and wrist bilaterally.  England had normal sensation in the fingertips.  According to the treatment note, England agreed to start steroid injections.  (Tr. 177, 178).  England's final visit with Dr. Dobyns was on May 19, 2003.  (Tr. 174). The treatment note shows that while England's tennis elbow had cleared up, the pain in the right arm from overuse persisted.  England had tenderness in the forearm on flexor side of the forearm in the muscles.  Her grip strength was strong but Dr. Dobyns noted the testing made England slightly uncomfortable.  The reflexes in the upper extremities were 2+ and symmetrical.  England had normal range of motion of the shoulder and elbow.  Provocative testing for tendinitis was negative.  (Tr. 174).  England was discharged from occupational therapy by Dr. Dobyns on May 19, 2003.  She was cleared for work that did not involve lifting over 15 pounds, and required no forceful or repetitive movements using the right hand.  (Tr. 175).

England had a follow-up appointment for hypertension on August 1, 2003, with Dr. Ferguson. She weighed 315 pounds.  Her blood pressure was 122/82 or "stable."  Neurologically, England's strength in upper and lower extremities was 5/5.  (Tr. 196-197).  On August 13, 2003, Dr. Dobyns completed another form, in which he stated England could return to work on a regular basis.  He characterized her prognosis as "fair."  (Tr. 170).  Dr. Dobyns referred England to Dr. George Lucas.

11

Dr. Lucas examined England on August 13, 2003.  (Tr. 168, 169).  Dr. Lucas described England as

a "large woman 5 foot, seven inches, 255 pounds.  He wrote:

> Objective:  To examination, the patient is a large woman who stands 5/7" and weighs
> 255 pounds.  She appears older than her stated age of 43 but is awake, alert, and
> oriented in all three spheres.  She demonstrates grossly normal sensation to her
> fingers.  She has no focal motor deficit and can oppose her thumb well.  She has fair
> strength of grip.  She has full range of motion of all of her digits and has full motion
> of her wrist and of her elbows.  She has some discomfort with resisted wrist extension
> on both elbows, referred to the lateral aspect of her elbows, but also has some similar
> pain on the flexor side or the medial aspect of her elbows.  She has a negative elbow
> flexion test but has a Tinel's sign over the ulnar nerve on the elbow on the right side.
> She has negative Tinel's sign at the ulnar nerve on the left and has a negative median
> Tinel's sign right and left.
>
> The patient has a paradoxical stool lifting test, performing excellent lifting by lifting
> the leg of the stool but stating throughout she cannot do flexor lifting.
>
> I believe this patient basically has a pain dysfunction syndrome and I did show her
> some gripping and strengthening exercises but beyond that I really do not think I
> would have anything to offer her treatment wise.  She was advised to continue her
> regular work but she is welcome to return on a p.r.n. basis.  Hopefully some of the
> ergonomic suggestions that Dr. Dobyns has made to the bank may prove somewhat
> fruitful as well.  (Tr. 169).

England had an appointment with Dr. Ferguson on September 2, 2003.  (Tr. 195).  She

weighed 307 pounds, and her blood pressure was 118/70.  The note indicates that this was a one

month follow-up for England's earlier complaints of headaches, numbness of the face and blurred

vision, which Dr. Ferguson suspected was due to stress and prescribed Lexapro.  Dr. Ferguson

referred to an x-ray of the right foot that showed "degenerative changes and bony osteophytes over

the metatarsals on the dorsal side of the foot.  No lytic lesions seen." (Tr. 195).  England was next

seen by Dr. Ferguson on October 1, 2003.  (Tr. 194).  She weighed 313 pounds, and her blood

pressure was 90/70.  (Tr. 194).  The note indicates that Dr. Howell, England's foot doctor,

recommended heel cups.  England had tenderness over the dorsum of the right  foot with motion or weight bearing.  As to the left foot, she had a flat arch and mild tenderness.  (Tr. 194).

The medical records from 2004 reveal that England was seen by Dr. Ferguson on January 19, 2004.  (Tr. 193).  The note reveals that England had lost six pounds and that her blood pressure was stable.  As to her left shoulder, England had tenderness over the anterolateral region.  The results of the Hawkins and Neer tests were positive.  Also, her rotator cuff strength was diminished on the left side.  Dr. Ferguson diagnosed England with "left impingement syndrome with possible rotator cuff tear."  (Tr. 193).

On March 8, 2004, England had her first appointment with Dr. Sara Tischendorf Folden.  (Tr. 324).  England's blood pressure was 130/90 and she weighed 318 pounds.  England had a positive Tinel's sign, decreased grip strength, and fluid along the joint of her left knee.  Dr. Tischendorf Folden diagnosed England with carpal tunnel syndrome, osteoarthritis flare left knee, obesity and tobacco abuse.  (Tr. 324).  England was next seen by Dr. Tischendorf Folden on April 5, 2004, for a follow up for her "joint pain." (Tr. 323).  England weighed 318 pounds and her blood pressure was 112/92.  England reported that her hip pain was improved but that "Vioxx not controlling pain." (Tr. 323).  In May 2004, England was referred to Dr. Talat Kheshgi for an evaluation of her "arthritis/arthralgias".  (Tr. 269-276).  England weighed 325 pounds and her blood pressure was 130/86.  Dr. Kheshgi wrote:

> MUSCULOSKELETAL:  TMJs, shoulders, elbows, wrists, CMCs, MCPs, PIPs and DIPs are normal without synovitis, although the patient did complain of pain and palpation of the PIPs.  Hips have normal range of motion.  Knees did have bilateral crepitus, although the patient did not complain of any pain.  The patient does complain of mild pain over the lateral malleolus of the left ankle, which was also mildly swollen. She did have hammer toe deformities, which wer(sic) mild, over the second and third digits on the left foot. SLR is 90 degrees.  Faber's is normal.  There

is no tenderness over the S1 joints, C-Spine, or L-Spine.  All 18 out of 18 tender points are positive.  Gait is normal.  Station is normal.

Impression and Plan:
1.  Arthritis.  The patient does complain of nonspecific arthralgias involving various joints.  She does have a history of having been diagnosed as osteoarthritis.  She certainly has some crepitus over the knees as well as has had steroid injections in the past.  She did not appear to have any synovitis of her joints.  However, she is rather concerned that she does have bilateral symmetrical involvement and would like (sic_ to investigated further.  I will go ahead and check her sed rate, rheumatoid factor, anti-CCP antibodies, as well as ANA.  I will also check her CBC and CMP, as well as UA since she has been on long-term high dose nonsteroidal anti-inflammatory therapy. However, I discussed with her that she appears to (sic) nonsteroidal anti-inflammatory arthritis, although somewhat concerning is the fact that she has several hours of morning stiffness.  However, the patient appears to have underlying fibromyalgia as well, which makes the separation between stiffness in the morning associated with an inflammatory arthritis versus any fibromyalgia more difficult.  I will go ahead and check x-rays of her hands and feet as well as ankles since she does have minimal swelling of the left ankle.  In the meantime, I have told her to decrease her Voixx to 25 mg p.o.q.d. instead of the 50 mg, which she is taking.  I have told her to increase her Ultram to one tablet three to four times a day as needed.  Since she does have a nonrestful sleep, I have given her prescription for Elavil 10 mg to be taken at h.s.  She says she has used it in the past with marked benefit.  I will see her back in followup in about two weeks at which time, I will discuss these results with (sic) to decide on a further course of action if needed.

2.  Osteoarthritis.  The patient does appear to have osteoarthritis.  I have told her to Osteo Bi-Flex or Cosamin DS over-the-counter, as well as participating regular exercise program especially swimming.  She has been given some exercises for the hands and wrists as well as for the knees, which she will do.  She does appear to have minimal swelling of the left ankle.  I am checking out x-rays.  In the meantime, I have told her to rest it.  I said for about 10 minutes every three to hour hours and keep it elevated once a day.  She is to avoid excessive weight bearing until it improves.  Since the patient was taking high dose Vioxx, I have discussed with her the benefits and risks of Cox II inhibitors.  Brochures from the Arthritis Foundation on osteoarthritis and Cox II inhibitors were provided.  The need to have regular labs while she is on high dose nonsteroidal anti-inflammatory medications was also discussed.

Following the recommendations of the American College of Rheumatology for monitoring the therapeutic use of nonsteroidal anti-inflammatory drug (NSAID) and in view of the warnings, precautions, and discussion of toxicities in the PDR, I have ordered a WBC count, differential and platelet count looking for drug induced thrombocytopenia, leukopenia, and eosinophilia, a hemoglobin and hematocrit looking

for anemia which may result from drug induced occult GI bleeding; a urinalysis looking for proteinuria, and pyuria or hematuria which may indicate interstitial nephritis or papillary necrosis; a Basic Metabolic Panel looking for drug induced renal damage, hyperkalemia and hypoglycemia, and for renal dysfunction which may induce or exacerbate hypernatremia, metabloic acidosis, or hyperchloremia; and a Hepatic Function Panel looking for drug induced hepatitis or hepatic dysfunction which would affect drug metabolism.

3.   Fibromyalgia syndrome.   The patient certainly appears to have features of fibromyalgia, although I discussed with her that this is diagnosis of exclusion. She had all 18 out of 18 tender points positive as well as history of sleep disturbance, nonspecific arthralgias, history of carpal tunnel syndrome, as well an anxiety disorder. She does complain of muscle soreness as well as alternating constipation and diarrhea, which may be related with underlying IBS. She says she has had a full workup by her primary care physician with her thyroid and everything being checked.  I discussed with her the importance of regular physical exercise including stretching exercises for about 30 minutes three times a week, which she should gradually build up to.  I have given her prescription for Elavil 10 mg at .h.s since she says sleep improvement definitely improves some of her symptoms.

4.   Left ankle sprain as addressed above.

5.   Nonspecific neurological complaints.   The patient is complaining of some numbness and tingling around her mouth and tongue as well as some changes in vision as well as some numbness and tingling, which is "shooting".  I have told her to followup with the neurologist for further work up of the same.

6.   Hypertension, currently on medications.

7.   Anxiety disorder, currently on Lexapro.  (Tr. 271).

At England's next appointment with Dr. Kheshgi on June 16, 2004 (Tr. 266-267), Dr. Kheshgi reviewed England's lab results.  Her CBC was normal "except for mildly increased eosinophils as well as minimally elevated sed rate of 23, the normal being 20 and CRP of 1.1.  Her CMP as well as UA were within normal limits.  Her anti-CCP antibodies were negative as was the rheumatoid factor and ANA."  (Tr. 267).  Dr. Kheshgi wrote:

IMPRESSION AND PLAN

1.  Arthritis.  The patient does have nonspecific arthropathy involving various joints appears to be osteoarthritis with crepitus in the right knee.  She is currently doing well on decreased dose of Vioxx to 25 mg p.o.q.d., although she does complain of occasional stiffness in the morning.  I have told her to take Tylenol Arthritis on a p.r.n. basis.  She will continue the regular physical exercise.  She says she is working at the gym in her complex; however, importance of water therapy etc was discussed. I will review the x-rays.  At this point, it does not appear that the patient has an inflammatory arthritis.

2.  Fibromyalgia syndrome.  The patient does have all tender points positive as well as history of sleep disturbance, CTS, and generalized anxiety disorder.   She is currently on Elavil 10 mg at h.s with improvement as well as Lexapro 5 mg p.o.q.d.

3.  Left ankle sprain, currently improved.  The patient still has not had x-rays which will be reviewed when they are available.

4.  Bilateral carpal tunnel syndrome, currently wearing wrist splints.  If this is to worsen any followup with her hand surgeon for possible carpal tunnel release was discussed.

5.  Hypertension, controlled on medications.  Her blood pressure today was 120/80.

6.  Anxiety disorder, currently on Lexapro.

7.  Hypertension, the patient is intolerance (sic)  of Lipitor and Zocor, this is being followed by her primary care physician.

8.  History of stomach ulcers/duodenitis in 1979, without any recurrence.

9.  History of ganglion removal from the right foot/laparotomy in the past.

10.  Status post steroid injections in both knees x 2, the last one being about a year ago. The patient is currently asymptomatic.  (Tr. 267).

On October 29, 2004, England had an appointment with Dr. Tischendoft Folden.  She weighed 318 pounds and had a blood pressure reading of 130/82.  (Tr. 319-321).  At this visit, England was treated for depression and anxiety. (Tr. 320).  England had a follow up appointment on December 8, 2004 with Dr. Tischendorf Folden.  (Tr. 316-318).  Her blood pressure was 140/98. England's examination showed:

16

**Cardiovascular**
Pedal pulses:  pulses 2+, symmetric
Periph, circulation:  no cyanosis, clubbing, edema, or varicosities

**Musculoskeletal**
Gait and station:  normal, can undergo exercise testing and/or participate in exercise program
Digits and nails**:**  no clubbing, cyanosis, petechiae, or nodes
RLE:  Tender to palpation over distal calf and skin muscles, no swelling, no  skin changes, FROM at ankle
LLE:  normal ROM and strength, no joint enlargement or tenderness

**Skin**
Inspection:  no rashes, lesions, or ulceration
Palpation:  subcutaneous nodules-diffusely over lower leg

**Neurologic**
Sensation:  intact to touch, pin, vibration, and position

**Mental Status Exam**
Judgment, insight:  intact
Orientation:  oriented to time, place, and person
Memory:  intact for recent and remote events
Mood and affect:  no depression, anxiety, or agitation  (Tr. 316-317)

On February 8, 2005, Dr. Sara Tischendorf Folden completed a Mental Residual Functional Capacity form, wherein she stated that she was treating England for a mental condition.  She further opined that this condition imposed only minimal limitations on England.  (Tr. 243).  England had routine office appointment with Dr. Tischendorf Folden on February 17, 2005.  She weighed 316 pounds and her blood pressure was 140/90.  England reported that "Lodine works best for pain." (Tr. 312-315).

Because of England's application for DIB, she was referred to Dr. Mike Lee for an internal medicine consultative examination on March 16, 2005.  (Tr. 258-261).  As part of the evaluation, England had an x-ray taken of the knee which showed "very minimal early degenerative changes."

(Tr. 265, 309).  An x-ray of the lumbar spine revealed:  "transitional lumbosacral vertebrae"and "severe degenerative disc disease with slight retrolisthesis of L3 on L4, and moderate degenerative spondylosis at L1-2." (Tr. 264, 310).  Dr. Lee noted that England was 66 inches tall, and weighed 315 pounds.  Her blood pressure was 128/88.  England was able to ambulate without a cane or walker. (Tr. 259).  With respect to England's back, there was no tenderness and no muscle atrophy. (Tr. 260).  Neurologically, England's mood and affect were appropriate, her mental status was normal, her cranial nerves were intact, her deep tendon reflexes were positive symmetrically, her gait was steady and her motor strength was 5/5.  (Tr. 260).  As to her extremities, England had a negative Homan's sign and her pulses were equal bilaterally.  England's knees revealed tenderness on palpation but no crepitus or effusion.  Dr. Lee wrote:

> Based on the objective evidence of finding, the claimant is able to sit and stand throughout the entire duration of the interview and examination.  The claimant is able to handle objects and hear and speak quite well.  The claimant had no problem walking in and out of the clinic.
>
> The range of motion of the lumbar spine is flexion of 80 degrees and extension of 20 degrees.  There is no instability of back and there is no circulatory deficits.
>
> There is no significant motor loss, and the neurologic examination is intact and none focal with normal motor, sensory and reflex exam.
>
> There is no loss of motion of the upper extremities, and she is able to button her cloth and pick up pen from the floor with no problem.  The claimant's prognosis for weight bearing status is fair.
>
> The claimant's gait is normal and she had no problem walking in and out of the clinic and the claimant did it with no help of anyone or any cane or walker.  The claimant has strong grip strength and there is no problem with using her hand to feel, reach.
>
> The claimant is able to walk down the hall way with no problem and she is not able to do heel and toe.  (Tr. 261)

A DDS physician, Dr. Eun Kwun, reviewed England's records and completed a physical residual functional capacity assessment on April 5, 2005. (Tr. 250-257). With respect to England's exertional capacity, Dr. Kwun opined that England could lift/carry up to 20 pounds occasionally, and could lift/carry up to 10 pounds frequently, could stand/walk about six hours, could sit about six hours, and could push/pull without limitations. (Tr. 250-251). As to postural limitations, England could never climb a ladder/rope/scaffold, could occasionally climb ramps/stairs, kneel, and crawl, and could frequently balance, stoop and crouch. (Tr. 252). Dr. Kwun identified the following manipulative limitations: England could do unlimited fingering (fine manipulation), and feeling (skin receptors), but was limited in her ability to reach all directions (including overhead) and handling (gross manipulation) due to her left shoulder pain caused by her shoulder impingement. (Tr. 253). England had no visual or communicative limitations. (Tr. 253-254). Finally, Dr. Kwun opined that England should avoid even moderate exposure to hazards but was otherwise unlimited. (Tr. 254).

On April 8, 2005, England was referred by Dr. Tischendorf Folden to Touchstone Imaging for an MRI scan of the lumbar spine. The radiologist wrote:

1. A small disc is present between S1 and S2.

2. L1-2 has a diffuse disc bulge but without central canal stenosis or neural foraminal stenosis.

3. L3-4 has a 2mm diffuse disc bulge resulting in mild bilateral neural foraminal stenosis and mild central canal stenosis. This AP diameter of the central canal is 8 mm

4. L4-5 has a diffuse disc bulge as well as, superimposed 2 mm right lateralizing disc protrusion along with facet hypertrophy. The findings result in moderate to severe right and mild left neural foraminal stenosis but without central canal stenosis.

19

> 5.  L5-S1 has a diffuse 3 mm disc bulge slightly eccentric to the right with facet hypertrophy resulting in moderate to severe and mild left neural foraminal stenosis. There is probable mild impingement of the right L5 nerve root and please also correlate clinically.  (Tr. 307-308).

Thereafter, England was referred to Dr. Renato Bosita with the Texas Back Institute for an evaluation.  She was examined on May 25, 2005.  (Tr. 289-292).  England weighed 300 pounds, and Dr. Bosita noted that "she had a difficult time getting off of the table more secondary to her size than to her level of pain."  (Tr. 289).  England was able to forward flex the L spine and touch the floor, but Dr. Bosita noted this caused great discomfort.  She had no difficulty heel and toe walking.  (Tr. 289).  In addition, England had "increased lumbar and posterior right thigh pain with the seated nerve root stretch test."  Further, her manual motor testing was 5/5.   Radiology reports of the cervical spine showed a loss of normal lordosis on lateral view and normal disc spaces.  In contrast, lumbar spine x-rays showed a convex curvature of 3-4 level and significant degenerative joint disease 3-4 as well as Schmorl's nodes 4-5.  (Tr. 290).  Based on the results of the x-rays and the physical examination, Dr. Bosita opined:  "neck pain most likely trapezial strain fairly acute and chronic low back pain with multilevel degenerative joint changes as well as facet arthrosis."  (Tr. 290).  Dr. Bosita referred England to Dr. Patel for epidural steroid injections.

England underwent caudal epidural steroid injections on June 3, 2005.  (Tr. 285-287).  England had a follow up appointment with Dr. Patel following the injections on July 5, 2005.  (Tr. 282-284).  The examination of England's back revealed that she had "palpable tenderness in the midline, flexion was fairly well tolerated to about 80 degrees but extension was more painful; facet loading was painful on both sides, she had full range of motion in her hip, Faber four testing was negative bilaterally, her lower extremity sensation was grossly intact, her reflexes were symmetric and

1+ in the patellar and achilles tendons; her strength was 5/5 in the ankle dorsiflexors, plantar flexors. (Tr. 283). Dr. Patel diagnosed England with "lumbar degenerative disc disease and lumbar arthrosis with chronic low back pain in need of pain management." (Tr. 283). England had a second series of injections by Dr. Patel on July 19, 2005. (Tr. 279-280).

England had a follow up visit with Dr. Tischendorf Folden on August 19, 2005. (Tr. 304-306). England complained of leg pain. She weighed 298.4 pounds and her blood pressure was 118/70. England had a normal gait, positive cervical muscle spasm and tenderness, and in her right lower extremity had a normal range of motion and strength. Also, Dr. Tischendorf Folden noted she was stable psychologically. (Tr. 304-306). England was seen again by Dr. Tischendorf Folden on October 4, 2005, for her complaints of back pain. (Tr. 297-298). England weighed 306 pounds and her blood pressure was 132/84. She had "poor alignment, decreased [range of motion], spine tenderness." (Tr. 298). Dr. Loyola referred England to Dr. Noor Gajray for an evaluation of low plow back and neck. She was examined by Dr. Gajray on October 25, 2005. In connection with this evaluation, England underwent and MRI of the lumbar spine. The MRI showed that England had multilevel degenerative disk disease and facet hypertrophy. This was likewise confirmed by Dr. Gajray in his examination of England's spine. England's range of motion in the lumbar spine was decreased. "There is bilateral lumbar paraspinous muscle tenderness." (Tr. 293). Neurologically England was intact. Dr. Gajray opined that England had low back pain secondary to degenerative disk disease and facet hypertrophy. (Tr. 293-294).

England had an appointment with Dr. Tischendorf Folden on March 23, 2006. (Tr. 330-332). England weighed 300 pounds and her blood pressure was 122/70. Dr. Tischendorf Folden wrote that England was "very depressed." Dr. Tischendorf Folden prescribed Zoloft. (Tr. 330-332). On March

28, 2006, Dr. Tischendorf completed a Questionnaire, in which she opined about England's functional abilities based on her diagnosis of morbid obesity, severe lumbar degenerative joint disease and degenerative joint disease of the knees and shoulders. (Tr. 327-329). Based on England's physical condition, Dr. Tischendorf opined that England could lift/carry 10 pounds occasionally, could lift and carry less than 10 pounds frequently, could stand/walk less than two hours, and could sit for six hours, with a rest break, and that she was limited reaching, handling and fingering. (Tr. 327). Dr. Loyola completed that same questionnaire as Dr. Tischendorf Folden. (Tr. 344-336). Dr. Loyola's assessment was the same as Dr. Tischendorf's assessment concerning England's residual functional capacity.

At the administrative hearing, England testified about her health and its impact on her daily activities. She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition. England testified that she has pain in her shoulder, knees, hip and back. (Tr. 255-356). England testified that she takes her medications (antidepressant, pain killers, and anti-inflammatory) in the morning and rests generally in a recliner until the pain subsides. (Tr. 356, 364). England estimated that she spends 2 to 3 hours laying down. (Tr. 368). Side effects of the medication include dizziness and grogginess. (Tr. 356). England estimated that she would walk about a block, and if she was having a good day, could walk two to three blocks. (Tr. 361). England stated that she stopped working because of pain. According to England, she was absent from work two to three times a week, and when she was at work, needed to change position. (Tr. 361-363). England testified that she weighs 299 pounds and further stated that her weight has fluctuated from 285 pounds to 341 pounds. (Tr. 364, 365). With respect to her weight, England testified that she had been told that her weight puts strain her back and knees. (Tr. 365). England testified that she

22

has missed events at her child's school due to pain. (Tr. 367). According to England, she was currently being treated by Dr. Loyola. (Tr. 367). Dr. Loyola had discussed surgical options with England but wanted to exhaust other available options first. (Tr. 367).

Upon this record, the objective medical evidence factor does not establish disability per se or that England's impairments met or equaled an applicable listing.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez*, 64 F.3d at 176). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 176 (5th Cir. 1995) (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources,

"the ALJ has sole responsibility for determining a claimant's disability status." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

The Social Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  As to opinions of examining physicians, the Commissioner gives more weight to the opinion of a source who has examined the plaintiff rather than the opinion of a source who has not performed such an examination.  *See* 20 C.F.R. §404.1527(d)(1), 416.927(d)(1).  Finally, as to the opinions of physicians who have reviewed the medical record, such as state agency physicians, the opinion is evaluated the above framework, and the ALJ must explain in the decision the weight given those opinions.  *See* 20 C.F.R. §§ 404.1527(f)(2)(ii) & (iii), 416.927(f)(2)(ii) & (iii).  An "'ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'"  *Newton*, 209 F.3d at 455 (quoting *Brown v. Apfel*, 192 F.3d 492, 500 (5th Cir. 1999)).  "The ALJ's decision

24

must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455.

According to England, the ALJ failed to apply this legal standard when he weighed and rejected the opinions rendered by a DDS non-examining physician (Dr. Kwun) and by England's treating physicians, in assessing England's RFC.

Here, the ALJ found that England retained the RFC for light work.  The ALJ wrote:

Although the claimant complained of a two year history of numbness and paresthesias in the palms of both of hands and aching pains in both shoulders, an EMG nerve conduction study in March 2003 revealed normal findings in both arms with no electrodiagnostic evidence of focal neuropathy, generalized neuropathy, plexopathy or radiculopathy (Exhibit 3F).

Treatment records of Mark Dobyns, M.D., reveal the claimant sought treatment from January 2002 to February 2003 for complaints of bilateral upper extremity pain and numbness and tingling in the hands.  Dr. Dobyns noted the claimant was having symptoms of carpal tunnel syndrome due to overuse and noted the claimant could work, but limited the claimant to lifting no more than 15 pounds and no forceful or repetitive movements with both hands.  Upon examination, Dr. Dobyns noted that the claimant has excellent strength bilaterally, grip strength strong bilaterally, and with only mild tenderness along the forearm, but it was minimal.  Further, the doctor noted the claimant has a negative Tinel's sign bilaterally and negative median nerve compression test bilaterally.  She was also noted to have a negative Tinel's sign at the elbow (Exhibit 4F).

In June 2004, the claimant underwent an evaluation with Talet Kheshgi, M.D.  The claimant reported problems with arthritis, carpal tunnel syndrome and arthralgias.  Based on his examination, Dr. Kheshgi indicated all findings were within normal limits.  The doctor noted his impression was the claimant has osteoarthritis, arthritis, fibromyalgia syndrome, hypertension, controlled with medication, nonspecific neurological complaints and anxiety disorder, controlled with medication.  Dr. Kheshgi noted he discussed the importance of regular exercise for the claimant and indicated she follow up with her treating physician (Exhibit 10F).

The medical evidence reveals a Two Dimensional Echo reveals a normal Doppler study with an ejection fraction of 58% (Exhibit 1F).  Medical records reveal the claimant complained of bilateral knee pain with swelling; however, a MRI of the left and right knee revealed bilateral joint effusions with findings indicating mild

osteoarthritis with medial joint compartment narrowing and osteophytosis. No meniscal tear seen and ligaments are intact (Exhibits 2F and 5F). X-ray of the lumbar spine revealed significant degenerative disc disease at L4/4 with a right convex lumbar curvature at L3/4 level. X-rays of the cervical spine revealed no evidence of any disc height loss (Exhibit 11F). An MRI of the lumbar spine revealed multilevel degenerative disk disease and facet hypertrophy (Exhibit 12F)

On March 16, 2005, the claimant underwent a consultative evaluation with Mike Lee, M.D. The claimant complained of arthritis, hypertension, obesity, carpal tunnel syndrome, and knee problems. Upon examination, Dr. Lee indicated the claimant was able to walk in and out of the examination room without a problem or assistance of a cane or walker; no tenderness of the lumbar spine was noted and no muscular atrophy; gait was steady; and reflexes, sensation, motor strength and cranial nerves were intact and normal. Bilateral knees were tender upon palpitation, but there was no crepitus of effusion. Based on his examination, Dr. Lee indicated that the claimant was able to sit and stand throughout the entire examination without complaint or problems. The doctor noted the claimant is able to handle objects, hear, speak, walk, sit, stand, with no instability of the back or circulatory deficits. Neurological examination is normal and there is no motor loss with normal sensation and reflexes. She was noted to have a strong grip and was able to use her hands to feel and reach. (Exhibit 9F).

The undersigned is aware of the questionnaires completed by Dr. Tischendorf-Folden and Dr. Walter Loyola which indicated the claimant is limited to lifting and carrying less than 10 pounds frequently and 10 pounds occasionally; standing and walking less than 2 hours in an 8 hour day; and sitting less than 6 hours in an 8 hour day; as well as occasional reaching, handling, fingering and frequent feeling, respectively (Exhibits 14F-15F). Further, Dr. Tischendorf-Folden indicated that the claimant was being treated by (sic) a mental condition, but that it does not impose more than minimal limitations. Also, Dr. Tischendord-Folden indicated in a letter dated October 4, 2005 that the claimant could not work due to her severe back disease (Exhibits 6F and 13F).

The undersigned finds that an opinion by a treating physician that a claimant is disabled or unable to work is not binding on the Commissioner. Rather, the medical findings and other evidence which support the physician's statement must be evaluated. The medical evidence must be complete and detailed enough to allow a determination to be made as to whether an individual is disabled. It is up to the undersigned to determine the nature and limiting effects of the impairment and the claimant's residual functional capacity to perform work-related activities. In this case, the undersigned finds it significant that Dr. Loyola's and Tischendorf-Folden questionnaires are found to be a one time evaluation reports obtained in the context

26

of litigation and thus less persuasive that the objective reports obtained in the context of an attempt at vocational rehabilitation.

Where a claimant's personal physician "might have been trying to support the application for disability benefits," his greater knowledge of the claimant's condition is not entitled to controlling weight.  In such [a] case, the treating physician has become an advocate for the claimant and his opinion is therefore accorded little weight.  Further, the undersigned finds it significant that, although Dr. Tischendorf-Folden indicated in her letter the claimant could not work due to severe back disease, her examination of bilateral upper and lower extremities revealed normal range of motion with no tenderness, deformity, normal strength, no instability and no pain. Further she was noted to have normal gait and station (Exhibit 13F).

The claimant testified that she has 3 years of college and that worked for a bank as a legal analyst reviewing trust documents; however, she is no longer able to work due to severe back, knee and shoulder pain and obesity.  She indicated that she is unable to even perform sedentary work.  She testified that she lives with her husband and 9 year old daughter.  She stated she spends most of her time home, but does visit with friends, do laundry and little things around the house.  She indicated that she lives across the street from the school and that she is able to go to teacher conferences and school parties.  She is able to grocery shop for short trips and that she is able to walk 2-3 blocks on a good day.  The claimant testified that she began missing 2 out of 5 days a week due to pain and that she would have to get up and walk away from her work station to refocus.  She testified that she was offered the treasurer position at PTA, but refused because she didn't think she could concentrate.  She stated she cannot go 8 hours without having to go home and lay down.  She is able to go grocery shopping 2 times a week for 30 minutes or so at a time.  She indicated that she usually gets what they need. The has not had back or carpal tunnel syndrome surgery.

The factor of subjective pain and discomfort, which in and of itself may prove to be disabling has also been duly recognized and considered.  Such subjective factors must be considered, even though the causes of such may not be fully demonstrated by the objective medical evidence.  Yet, all such subjective pain and discomfort are not necessarily disabling.  There mere inability to work without some degree of pain or discomfort of a minimal to mild nature, does not necessarily constitute a disability for Social Security purposes.  The undersigned has attempted to discharge his duty to find the nature, degree and level of the claimant's subjective pain and other discomfort, and the functional restrictions that it imposes, by carefully considering all of the pertinent evidence in the record as a whole which includes a careful consideration of the claimant's testimony at the hearing.  However, it appears from the weight and preponderance of all the credible evidence of the record, including the medical evidence and testimony that the pain and discomfort factor is not of such persistence or severity to be disabling.

27

As is evident from the claimant's testimony and the complaints to treating physicians, the primary basis on which disability is alleged is disabling pain. The undersigned realizes these allegations may not be rejected solely due to the lack of objective medical evidence, which fully corroborates the alleged severity of pain. See Social Security Ruling 96-7p and 20 CFR 404.1529. Pursuant to SSR 96-7p and 20 CFR 404.1529, pain cannot be found to have a significant effect upon a disability decision unless the medical signs or laboratory findings show a medically determinable physical or mental impairment is present which can reasonably be expected to produce the pain alleged. When the claimant's alleged or reported symptoms suggest the possibility of a greater restriction on the ability to function that can be demonstrated by the objective medical evidence alone, then other information must be considered in conjunction with the medical evidence, such as the claimant's daily activities, prior work record, functional restrictions, medication and other treatment for the relief of pain, and information and observations by physicians and third parties regarding the nature and the extent of the claimant's symptoms.

The medical history and other evidence of record do not entirely substantiate the intensity and persistence of pain as alleged by the claimant or the effect of the impairments have on the claimant's ability to work. The claimant's testimony as to the subjective complaints and functional limitations is neither entirely credible nor consistent with the evidence of record. Although, the record reflects that the claimant has testified that she is unable to work due to low back pain, there is no real objective medical evidence in the record to support these allegations. The medical record is absent of any aggressive treatment, like surgical intervention, concerning the claimant's alleged impairments. Further, the claimant's MRI and x-rays do not indicate any nerve root compression. Also, the objective medical evidence reveals the claimant was able to walk in and out of the examination room without a problem; there was no tenderness of the lumbar spine and no muscular atrophy; gait was steady; and reflexes, sensation, motor strength and cranial nerves were intact and normal. The doctor noted the claimant is able to handle objects, hear, speak, walk, sit, stand, and with no instability of the back or circulatory deficits (Exhibit 9F). In addition, Dr. Dobyns noted the claimant could work, but limited the claimant to lifting no more than 15 pounds and no forceful or repetitive movements with both hands. Based on the lack of medical evidence, these alleged impairments cannot be said to be so severe that they interfere with his (sic) physical ability to do basic work.

In light of the inconsistencies in the record, the claimant's testimony, and the evidence that claimant is able to engage in some daily activities, which includes doing laundry, caring for her personal needs, caring for her 9 year old daughter, driving, performing some household chores, attending PTA meetings and going grocery shopping, indicates she should be able to perform a full range of exertional activities necessary to perform a wide range of light work. Moreover, the ability to perform activities such as driving, performing household chores and attending PTA meetings are

inconsistent with the presence of a condition which would preclude all work activity. The fact an individual has some pain does not mean that disability is established within the meaning of the Act.  An individual need not be totally pain free in order to perform work-related activities.  (Tr. 16-19).

Here, England challenges the ALJ's determination of her RFC.  The ALJ determined that England could perform a full range of light work.  England contends that objective medical records along with her testimony demonstrate that she cannot perform a full range of light work in light of her obesity, low back pain and shoulder impingement, and that the ALJ erred in discounting the opinions of her treating physicians, Drs. Loyola and Tischendorf-Folden, because they were solicited in connection with her application for DIB benefits.   According to England, x-rays and an MRI taken  in March and April 2005, respectively, support England's subjective complaints of low back pain.  As to the RFC assessments completed by Dr. Loyola and Tischendord-Folden, England contends that the assessments are consistent with their treating records and with an RFC assessment completed by a DDS physician, Dr. Kwun, wherein Dr. Kwun opined that England was limited in her ability to reach all directions, including overhead and handling (gross manipulation), and needed to avoid exposure to hazards due to left shoulder impingement.

Here, upon the totality of this record, to the extent that the ALJ discounted the RFC assessments completed by England's treating physicians because the opinions were solicited in connection with England's application for DIB benefits, the ALJ failed to follow the Social Security regulations regarding the six factors set forth in 20 C.F.R. § 404.1527(d), which must be considered before a treating physician opinion may be rejected.  Here, the ALJ failed to discuss how long or how often England was seen by Dr. Tischendorf Folden or Dr. Loyola, the extent of their treating relationships, the consistency of England's symptoms with the record as a whole, and, in particular,

that none of England's health care providers voiced doubts as to the legitimacy of England's complaints.  There is no suggestion in any of the medical reports that England has been exaggerating her symptoms.  Moreover, England contends the ALJ erred by discounting Dr. Dobyns' assessment that while England could work, she was limited to lifting no more than 15 pounds and no forceful or repetitive movements with both hands, given his treating relationship with England.  According to England, his finding that she can lift no more than 15 pounds is inconsistent with the ALJ's RFC finding that she can perform a full range of light work.

It is undisputed that England alleged she was disabled due to osteoarthritis, degenerative disc disease, hypertension, obesity, carpal tunnel syndrome, bilateral knee problems, hypertension, and anxiety, and that the ALJ found these impairments to be severe impairments within the meaning of the Act.  However, rather than evaluate these impairments, singly or in combination, the ALJ extrapolated that England was  alleging she was disabled due to pain.  This misstates England's alleged impairments.  Moreover, because the ALJ only evaluated pain as a disabling impairment, none of England's other impairments were thoroughly considered.  With respect to hypertension, the medical records show that England's hypertension was well controlled through medication. However, as to England's obesity, the records are replete with references to England's height and weight, which clearly suggest she is obese, and has alleged impairments involving her knee and back, which are affected by her weight.  Moreover, Dr. Bosita noted England's difficulty in getting off the exam table was due to her weight.  The Social Security Regulations outline the steps the ALJ should have followed in assessing obesity.  The ALJ failed to do so in this case.  The ALJ failed to give adequate consideration to the effect of England's obesity in combination with her other severe impairments.

In sum, the ALJ's RFC assessment that England can perform a full range of light work conflicts with the assessments by the DDS physicians, and of England's treating physicians, including Dr. Ferguson, Dr. Dobyns, Dr. Tischendorf-Folden, and Dr. Loyola.  The law is clear that the ALJ must discuss the uncontroverted evidence that he chooses not to rely on, as well as the significantly probative evidence he rejects.  Here, the ALJ, without the assistance of a medical advisor,  adopted some of the restrictions identified by the examining and non-examining physicians but disregarded others, without explanation.  The ALJ should have assessed *all* of the medical source opinions, should have discussed the reasons for the weight given to each, and should have stated his specific findings regarding England's limitations, setting forth how he reconciled the discrepancies in the records.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Seders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional

impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

England contends that the ALJ's credibility assessment is not supported by substantial evidence. According to England, the ALJ misstated her testimony and overstated her ability to perform basic activities such as doing laundry, attending parent/teacher conferences and school parties, in finding her testimony not credible.  In particular, England argues that the limited nature of her daily activities show that her daily activities have significantly diminished as she spends most of her day resting in a recliner, that she receives assistance from her family in grocery shopping and other activities. Moreover, to the extent the ALJ suggests that her back impairment is not severe because she has not had surgery, England points to her testimony at the hearing, at which she stated that Dr. Loyola had brought up surgery but wanted to exhaust other treatment modalities before surgery. Moreover, England contends that the ALJ failed to properly evaluate the side effects of her medication or take into account the fact that none of her treating or examining physicians questioned the validity of her pain complaints or need for pain relief.  Here, upon this record, the ALJ's credibility assessment is not supported by substantial evidence.  While England did note initial relief from various steroid injections in the knee, the record is replete with references to problems associated with her back as documented in x-rays taken March 2005, MRI's taken in May and October of 2005, the results of which were confirmed in clinical testing by Dr. Bosita, Dr. Patel, and Dr. Gajray.  Here, there was a convergence of objective tests and physical examinations that support

England's allegations.  In addition, she sought treatment for the pain, she was prescribed pain medication and she reported that because of pain she was unable to engage in normal social interactions such at PTA.

Here, because the ALJ made and supported his credibility determination based, in part, on his rejection of the conclusions reached by treating physicians, examining consultative physicians and of the DDS physicians concerning England's functional limitations, and given that the matter should be remanded for further development of the record, and because the credibility assessment is inextricably intertwined with the ALJ's assessment of England's RFC, which is not supported by substantial evidence, this factor neither weighs in favor of or against the ALJ's determination.

### D.  Education, Work History and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that England, at the time of the hearing, was forty-five years old, and she had a high school education.  Her past relevant work was as a bank lead operations representative, which required her to sit up to five hours, stand up to 1 hour, but required no walking, and which also required her to reach, write, type, handle small objects up to 5 hours, as well as lift less than 10 pounds frequently and up to 20 pounds occasionally.

33

Given that the matter should be remanded for further record development, which includes an assessment of England's RFC, on remand the ALJ should reconsider, at step 4, England's ability to perform her past work or, at step five, any work.


## V.  Conclusion

Based on the foregoing, and the conclusion that a further development of the record is necessary because substantial evidence does not support the ALJ's finding that England could perform a full range of light work, and because the ALJ failed to apply the proper standards in evaluating medical opinions, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge

RECOMMENDS that Defendant's Motion for Summary Judgment (No. 9), be DENIED, that Plaintiff's Motion for Summary Judgment (Document No. 8) be GRANTED, and that this case be REMANDED to the Social Security Administration pursuant to Sentence 4 of 42 U.S.C. §405(g), for further proceedings consistent with this Recommendation.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Serv. Auto Assn,*

79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the

United States District Court Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 31ST day of January, 2008.

Frances H. Stacy
United States Magistrate Judge